# EXHIBIT A

PUBLICATION INFO et al no

## IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS

| | |
|---|---|
| D.H., individually and on behalf of all<br>others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**LABETTE HEALTH FOUNDATION,<br>INc.,**<br>Serve:<br>Spenserv, Inc.<br>6201 College Blvd.<br>Suite 500<br>Overland Park, Kansas 66211<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No: LBP-2022-CV-000031<br>)   Division:<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>SUMMONS</u>

**To:**
 **LABETTE HEALTH FOUNDATION INC.**
Serve:
Spenserv, Inc.
6201 College Blvd.
Suite 500
Overland Park, Kansas 66211

**A lawsuit has been filed against you.**

**Within (21) days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached petition or a motion under K.S.A. 60-212. The answer or motion must be served on the plaintiff's attorney, or the plaintiff if plaintiff has no attorney, at the following address:**

Maureen M. Brady
Lucy McShane
MCSHANE & BRADY, LLC.
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone: (816) 888-8010
Facsimile: (816) 332-6295

E-mail: mbrady@mcshanebradylaw.com
lmcshane@mcshanebradylaw.com

**If you fail to file an answer or motion as described above, judgment by default will be entered against you for the relief demanded in the petition. You also must file your answer or motion with the Court.**

**If you file an answer, any related claim which you may have against the plaintiff must be stated as a counterclaim in your answer. If you fail to do so you will thereafter be barred from making such claim in any other action.**

**Date** _____          **Clerk of the District Court.**

**Clerk's Seal**              **By** _____
                                    **Deputy**

## RETURN OF SERVICE OF SUMMONS ON AN INDIVIDUAL

I hereby certify that I served a copy of this summons and a copy of the Petition, Order and Motion to Keep Plaintiff's Identity Private, Motion and Order for Private Process Server, Plaintiff's Open Interrogatories to Defendant, Plaintiff's First Requests for Production of Documents to Defendant, Demand for Jury Trial, and Entry of Appearances for both Lucy McShane and Maureen M. Brady to Labette Health  in the following manner:

_____(1)  **Personal Service** - on the \_\_\_ day of _____, 2\_\_\_\_, by delivering or offering to deliver the documents to the above-named person;

_____(2)  **Residence Service** - on the \_\_ day of _____, 2\_\_\_\_,  by leaving the documents at the dwelling or usual place of abode of the above-named person, with some person of suitable age and discretion who resides there;

_____(3)  **Residence Service** - on the \_\_ day of _____, 2\_\_\_\_,  by leaving a copy of the documents at the dwelling or usual place of abode of the above-named person and mailing to that person by first-class mail a notice that the copy has been left at the individual's dwelling or place of abode;

_____(4)  **Return Receipt Delivery** - by causing to be delivered on the \_\_\_\_\_ day of\_ _____, 2\_\_\_\_, the documents by return receipt delivery to the above-named person at the following address: _____with delivery being made by the following person or entity: _____.

A copy of the return receipt evidencing delivery is attached to this Return of Service.

_____(5)  **Return Receipt Delivery Refused** - by mailing on the _____ day of _____, 2\_\_\_, the documents by first-class, postage prepaid, to the above-named person at the following address: \_\_\_\_\_.

_____(6)  **Other Method of Service -** \_\_(Describe other method of service allowed by law).

_____(7)  **No Service**.  The above-named person was not served for the following reason(s):

_____

3

## CERTIFICATION OF
## RETURN ON SERVICE OF SUMMONS


### Service by
### Law Enforcement Officer

I declare under penalty of perjury, as provided in K.S.A. 21-3805, that the foregoing Return on Service of Summons is true and correct.

Executed on _____, 20___.


_____
_____ (Signature and Title of Officer) _____

4

**Service Outside State**
**Affidavit of Service**

STATE OF _____ )
                                    ) ss.
COUNTY OF _____ )

    I, _____(name)_, am authorized to serve process in civil actions in the state of
_____.

    I declare under penalty of perjury under the laws of the state of Kansas that the foregoing
Return on Service of Summons is true and correct.

Executed on _____, 2____.


                                _____
                                (Signature and Title of Officer)

Subscribed and sworn to before me this ____ day of _____, 2____.

                                _____
                                (Signature of person authorized to administer oath)

5

**Service by a Person other than a Law Enforcement Officer in Kansas**

**Affidavit of Service**

STATE OF KANSAS )
               ) ss.
COUNTY OF _____ )

    I, _____(name)_, swear or affirm that the foregoing Return on Service of Summons is true and correct.

Executed on _____, 2____.

                    _____
                    (Signature of Person serving process)

Subscribed and sworn to before me this ____ day of _____, 2____.

                    _____
                    (Signature of person authorized to administer oath)

**Authority**

    K.S.A. 60-302, 60-213(a), 60-303, 60-308, and 60-312.

**Notes on Use**

    The summons must be signed by the clerk or deputy, dated the day it is issued, and bear the court's seal. K.S.A. 60-302.

    The time within which an Answer or other responsive pleading is to be filed by a party served with process is:

- 21 days for a defendant served in-state other than an insurance company served under K.S.A. 40-218, K.S.A. 60-212;
- if a defendant is served out-of-state no default may be taken against that defendant until 30 days after service, K.S.A. 60-308;
- 40 days for an insurance company when service is made on the commissioner of insurance under K.S.A. 40-218;

unless otherwise provided by law. The times within which a responsive pleading must be filed are exclusive of the date of service of process.

    The sheriff of the county in which the action is filed must serve any process by any method authorized by K.S.A. 60-303, or as otherwise provided by law, unless a party, either personally or through an attorney, notifies the clerk that the party elects to undertake responsibility for service. K.S.A. 60-303(b).

    The sheriff shall endorse upon every summons, order of arrest, or for the delivery of property, or of attachment, injunction execution or order of sale, the day and hour it was received by him or her. The sheriff shall execute every summons, order or other process and return the same as required by law. K.S.A. 60-2602.

Methods of service of process within this state are described in K.S.A. 60-303. Methods of service of process outside the state are described in K.S.A. 60-308. Persons to be served are set forth in K.S.A. 60-304.

Methods of service described in K.S.A. 60-303 are service by return receipt delivery [K.S.A 60-303(c)], and personal and residence service [K.S.A 60-303(d)]. Service by publication is authorized by K.S.A. 60-307. Additional methods of serving garnishment process include service by first-class mail, telefacsimile, and internet electronic mail [K.S.A. 60-303(f)].

An acknowledgment of service on the summons is equivalent to service. The voluntary appearance by a defendant is equivalent to service as of the date of appearance. K.S.A. 60-303(e).

K.S.A. 60-308 provides that service of process may be made upon any party outside the state. If service of process is made upon a person domiciled in this state or upon a person who has submitted to the jurisdiction of the courts of this state, it shall have the force and effect of service of process within this state; otherwise it shall have the force and effect of service by publication.

Service of process outside the state shall be made (A) in the same manner as service within this state, by an officer authorized to serve process in this state or in the state where the party is served or (B) by service by return receipt delivery. No order of a court is required.

Pursuant to K.S.A. 60-203 a civil action is commenced at the time a petition is filed with the court if service of process is obtained or the first publication is made for service by publication within 90 days after the petition is filed, except that the court may extend that time an additional 30 days upon a showing of good cause by the plaintiff. If service of process or first publication is not made within the 90 day time period, or within the 60-308-day extension of time for service, the action is deemed commenced as of the date of service of process or first publication.

An officer or other person receiving a summons or other process must file a return of service not later than 14 days after the service is effected. If the process cannot be served it must be returned to the court within 30 days after the date issued with a statement of the reason for the failure to serve it, except the court may extend the time for service up to 90 days after the date issued. Upon receipt of the return on any summons or other process, the clerk must serve a copy of the return on the attorney for the party requesting issuance of the summons or other process or, if the party has no attorney, on the requesting party. K.S.A. 60-312(d).

K.S.A. 60-303 provides for service of process by return receipt delivery which is effected by certified mail, priority mail, commercial courier service, overnight delivery service, or other reliable personal delivery service to the party addressed, in each instance evidenced by a written or electronic receipt showing to whom delivered, the date of delivery, the address where delivered, and the person or entity effecting delivery. K.S.A. 60-303(c)(1).

After service and return of the return receipt, the sheriff, party, or party's attorney must execute and file a return of service. The return of service must state the nature of the process, to whom delivered, the date of delivery, the address where delivered, and the person or entity effecting delivery. It must include a copy of the return receipt evidencing delivery. K.S.A. 60-303(c)(4).

If the sealed envelope is returned with an endorsement showing refusal to accept delivery, the sheriff, party, or the party's attorney may send a copy of the process and petition or other document by first-class mail, postage prepaid, addressed to the party to be served, or may elect other methods of service. If mailed, service is considered to be obtained three days after the mailing. Mailing must be evidenced by a certificate filed with the clerk. If the unopened envelope sent by first-class mail is returned as undelivered for any reason, service is not obtained and the sheriff, party, or party's attorney must file an amended certificate with the clerk indicating nondelivery. Mere failure to claim the sealed envelope sent by return receipt delivery is not refusal of service within the meaning of this subsection. K.S.A. 60-303(c)(5).

Proof of personal and residence service must be filed with the court and made as follows:

(1) Every officer to whom summons or other process is delivered for service must make a statement subject to penalty of perjury as provided in K.S.A. 21-3805, and amendments thereto, as to the time, place, and manner of service. K.S.A. 60-312(a)(1).

(2) If process is delivered to a person, other than an officer, for service, the person must make an affidavit or a declaration pursuant to K.S.A. 53-601, and amendments thereto, showing as to the time, place, and manner of service. K.S.A. 60-312 (a)(2).

7

When service is made outside this state, the server must file an affidavit or a declaration pursuant to K.S.A. 53-601, and amendments thereto, or any other competent proof, stating the time, manner, and place of service. The court may consider the affidavit or declaration or any other competent proof in determining whether service has been properly made.  K.S.A. 60-308(a)(2).

8

### IN THE DISTRICT COURT OF LABETTE COUNTY, KANSAS
### PARSONS DIVISION

**CYNTHIALANE and D.H.  individually and on behalf of themselves and all others similarly situated,**

                              Plaintiff,

        v.

**LABETTE HEALTH FOUNDATION, INC.,**
Serve:
Spenserv, Inc.
6201 College Blvd.
Suite 500
Overland Park, Kansas 66211

                              Defendant.

## CLASS ACTION PETITION FOR DAMAGES

Plaintiffs' Cynthia Lane and D.H. ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Petition for Damages against Defendant Labette Health Foundation, Inc. ("Defendant" or "Labette") and hereby alleges upon personal knowledge as to her and her own actions, and upon information and belief, including the investigation of counsel as follows:

### I.  NATURE OF THE CASE

1.  Defendant Labette is a health-care provider that provides "acute, intensive, and inpatient rehabilitation services" in southeastern Kansas to a six-county area that services thousands of patients.[1]

---

[1] https://www.labettehealth.com/about-us/, (last accessed May 27, 2022).

2.      As part of the services Labette provides, Labette requires patients to provide personally identifiable information ("PII"), including full name and Social Security number, as well as protected health information ("PHI"), including medical treatment information, diagnosis information, treatment costs, dates of service, prescription information, Medicare and/or Medicaid number, and/or health insurance information (collectively, "Private Information").

3.      Between the dates of October 15, 2021 and October 24, 2021, an unauthorized individual or individuals "potentially accessed and acquired information from portions of [Defendant's] network between October 15, 2021 and October 24, 2021."[2] This incident (hereinafter, the "Data Breach") was not fully understood by Labette until three and half months later, on February 11, 2022, when, "following an extensive review and analysis of the data at issue, Labette Health determined that certain files and folders that may have been accessed or acquired contained identifiable personal and/or protected health information of employees and certain patients who received services from Labette Health…"[3]

4.      Defendant's Notice Regarding Security Incident (the "Notice"), which states "*security of the personal information in its possession is Labette Health's top priority*," omits the following critical information: (i) when Labette first knew of the Data Breach; (ii) specifically what information was accessed or acquired specific to Plaintiffs and the Class Members (the Notice only lists the Private Information and says what was compromised was "one or more of the following (to the extent it resided on Labette Health's system)"; and, (iii) how Labette's servers were compromised.

---

[2] https://www.labettehealth.com/about-us/labette-health-security-breach/, (last accessed May 27, 2022)(the "Notice").
[3] *Id.*

5.      Labette also failed to notify consumers for a full month from when their investigation was complete, waiting from February 11, 2022 to March 11, 2022 until the Notice letters were finally disseminated. Further, if Labette had been monitoring its servers for the presence of hackers, malware, ransomware, or whatever type of cyberattack occurred here (Plaintiffs and the Class Members have no way of knowing because the Notice does not provide this information), Labette would have detected the presence of the unauthorized individual(s) in October of 2021, four and a half months before Plaintiffs and the Class Members were finally notified of the existence of the Data Breach. When considering the value of the Private Information at stake, and the proclivity of this Private Information to end up being sold to criminals on the dark web (as that is the *modus operandi* of a targeted hacking effort such as this Data Breach), every second that passes is critical to the victims' efforts in mitigating risk and the harm caused by Defendant. Waiting months before informing Plaintiffs and Class Members of their data being compromised compounds the harm caused by the Data Breach itself.

6.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect patients' and employees' Private Information.

7.      Plaintiffs bring this class action lawsuit on behalf of those current or former patients and employees of Labette who are similarly situated to address Defendant's inadequate safeguarding of Class Members' Private Information that Defendant collected and maintained, and for failing to provide timely and adequate notice to Plaintiffs and other Class Members that their information had been subject to the unauthorized access of an unknown third party.

8.    Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks.

9.    Upon information and belief, the mechanism of the hacking and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that property in a dangerous condition.

10.   Defendant disregarded the rights of Plaintiffs and Class Members (defined below) by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard patient Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to properly train its staff and employees on proper security measures; and failing to provide Plaintiffs and Class Members prompt notice of the Data Breach.

11.   In addition, Defendant and its employees failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its property, it would have discovered the intrusion sooner, as opposed to letting cyberthieves roam freely in Defendant's IT network for nine days.

12.   Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves. This present risk will continue for their respective lifetimes.

13.   Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members'

names, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

14.     As a result of the Data Breach, Plaintiffs and Class Members have been exposed to a substantial and present risk of fraud and identity theft. Plaintiffs and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

15.     Plaintiffs and Class Members will incur out of pocket costs for, e.g., purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16.     Plaintiffs seeks to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was accessed during the Data Breach.

17.     Plaintiffs seeks remedies including, but not limited to, compensatory damages, nominal damages, and reimbursement of out-of-pocket costs.

**II.     JURISDICTION AND VENUE**

18.     This Court has jurisdiction over the parties and the subject matter of this Action.

19.     Jurisdiction is proper because both Plaintiffs and Defendant are citizens of the state of Kansas. Additionally, Defendant is a corporation operating in and licensed by the state of Kansas.

20.     Venue is proper in Labette County, Kansas pursuant to K.S.A. Stat. § 60-604 because: under K.S.A. Stat. § 60-604(1), Defendant's registered office is located in Labette County and, under K.S.A. Stat. § 60-604(2), the cause of action arose in Labette County (Defendant, who

is located in Labette County had a data breach). Specifically, the Defendant's principal place of business is located in Parsons, Kansas, which is located in Labette County, Kansas.

### III.   PARTIES

*Plaintiffs*

21.     Plaintiffs Cynthia Lane is a resident of the state of Kansas. Plaintiffs is a current or former patient of Labette Health who received medical services and treatments from same. At the time of receiving such services and treatments, Plaintiffs was required to provide her Private Information to Defendant. Plaintiffs was notified of Defendant's Data Breach and her Private Information being compromised via mailed notice on March 11, 2022.

22.     Plaintiffs D.H. is a resident of the state of Kansas. Plaintiffs is a current or former patient of Labette Health who received medical services and treatments from same. At the time of receiving such services and treatments, Plaintiffs was required to provide her Private Information to Defendant. Plaintiffs was notified of Defendant's Data Breach and her Private Information being compromised via mailed notice on March 11, 2022.

*Defendant Labette Health Foundation, Inc.*

23.     Defendant Labette Health Foundation Inc., a not for profit corporation, is registered to do business in the State of Kansas. Defendant is a health services provider with its principal place of business located at 1902 S. United States Highway 59, Parsons, Kansas 67357.

24.     Defendant advertises itself as "Labette Health" and previously did business under the name Labette County Medical Center Foundation, Inc.

### IV.   FACTUAL ALLEGATIONS

#### DEFENDANT'S BUSINESS

25.     Defendant Labette is a health-care provider that provides "acute, intensive, and inpatient rehabilitation services" in southeastern Kansas to a six-county area that services thousands of patients.[4]

26.     In the ordinary course of receiving treatment and healthcare services from Labette, patients and employees are required to provide sensitive, private information. However, in Labette's "Notice of privacy practices effective November 17, 2021," (hereinafter, the "Policy") Labette fails to articulate specifically the data that they collect from their patients and employees.[5]

27.     Labette's Policy does, however, articulate "how Labette Health may use and disclose health information" which includes a long list of potential uses, including for: payment, healthcare operations, business purposes (inclusive of sharing the information with business associates due to various "contract[ual obligations] or arrangements"), creating de-identified health information (though the Policy does not state what is done with this de-identified health information), uses and disclosures required by law, disclosures for public health activities, disclosures about victims of abuse, neglect or domestic violence, disclosures for judicial and administrative proceedings, disclosures for law enforcement purposes, disclosures regarding victims of crime, disclosures to avert a serious threat to health or safety, disclosures for specialized government functions, disclosure for fundraising, disclosure or remunerated treatment communications and "other uses."[6]  None of the above authorized Labette to disclose the Private Information to cybercriminals as it has done in this instance.

28.     Notably, the Policy became effective (and, therefore, likely changed) after the Data Breach occurred and there is no previously cached version of the Policy online: which means that

---

[4] https://www.labettehealth.com/about-us/, (last accessed May 27, 2022).
[5] https://www.labettehealth.com/notice-of-privacy-practices/, (last accessed May 30, 2022).
[6] *Id.*

the Policy might not have been readily accessible to patients and employees, and thus, to Plaintiffs and the Class Members, prior to the Data Breach.

29.     While the exact data that Labette collects was omitted from the Policy, Labette does in fact collect the set of Private Information that was compromised in this Data Breach - full name and Social Security number, medical treatment information, diagnosis information, treatment costs, dates of service, prescription information, Medicare and/or Medicaid number, and/or health insurance information – because that information could not have been compromised if Labette was not storing it.

30.     Additionally, Labette may receive Private Information from other individuals and/or organizations that are part of a patient's "circle of care," such as referring physicians, patients' other doctors, patient's healthcare plan(s), close friends, and/or family members.

31.     Additionally, in a cached version of Labette's "Labette Health" authorization for disclosure of PHI, Labette fails to disclose the parties that they readily admit in their Policy that they share information with.[7] The authorization for disclosure also does not detail all the instances where they share their PHI.

32.     As a condition of receiving medical care and treatment at Defendant's facilities, Defendant requires that its patients entrust it with highly sensitive personal information.

33.     On information and belief, Defendant made promises and representations to its employees and patients, including Plaintiffs and Class Members, that the PHI and PII collected from them as a condition of utilizing Defendant's services and/or employment would be kept safe, confidential, and that the privacy of that information would be maintained.

---

[7]    **Ex.    A,**    PHI    Disclosure    Form    –    Labette    Health,    also    accessible    at
https://www.labettehealth.com/media/1034/authorization-for-disclosure-of-phi-original-3-14-16.pdf.

34.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

35.     Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

36.     Plaintiffs and the Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business and health purposes only, and to make only authorized disclosures of this information.

## THE DATA BREACH

37.     On an unspecified date, which is omitted from the Notice Regarding Security Incident, between October 2021 and February 2022, the Defendant determined that "unauthorized individual(s) potentially accessed and acquired information from portions of [Defendant's] network between October 15, 2021 and October 24, 2021."[8]

38.     As the Notice states, "[o]n February 11, 2022, following an extensive review and analysis of the data at issue, Labette Health determined that certain files and folders that may have been accessed or acquired contained identifiable personal and/or protected health information of employees and certain patients who received services from Labette Health[.]"[9]

39.     This information includes the aforementioned Private Information, which includes individuals' full name and "one or more of the following (to the extent it resided on Labette Health's system)": Social Security number, medical treatment and diagnosis information,

---

[8] Notice.
[9] Id.

treatment costs, dates of service, prescription information, Medicare or Medicaid number, and/or health insurance information.[10]

40.     Upon information and belief, the unauthorized individuals did in fact access Labette's files, and exfiltrate the Private Information of patients and employees during the approximately nine days that those unauthorized individuals had unfettered access to Labette's network (hereinafter, the "Data Breach").

41.     Upon information and belief, the Private Information contained in the files accessed by the unauthorized individuals was not encrypted.

42.     While Labette stated in its Notice to Plaintiffs and Class Members (as well as on its website) that it concluded its "extensive review and analysis of the data at issue" on February 11, 2022, it did not state when it first learned of the Data Breach. Further, while Labette stated in its Notice that it concluded said review on February 11, 2022, Labette failed to immediately begin notifying victims of the Data Breach – waiting exactly a month (March 11, 2022) until the Notice was disseminated and posted on Defendant's website.

43.     Due to Defendant's incompetent and ineffective security measures, Plaintiffs and the Class Members now face a present and substantial risk of fraud and identity theft and must deal with that threat forever.

44.     Plaintiffs believe their Private Information was stolen in the Data Breach and that said information was subsequently posted for sale on the dark web, as that is the *modus operandi* of all cybercriminals.

45.     Defendant had obligations created by HIPAA, contract, industry standards, common law, and its own promises and representations made to Plaintiffs and Class Members to

---

[10] *Id.*

keep their Private Information confidential and to protect it from unauthorized access and disclosure.

46.     Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

47.     Had Defendant indicated to Plaintiffs and the Class Members that it would not comply with its privacy policies or the governmental regulations on maintaining patient privacy, Plaintiffs and the Class Members would not have provided their PHI and PII to Defendant.

48.     Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the breach.

49.     In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[11] Of the 1,473 recorded data breaches, 525 of them, or 35.64%, were in the medical or healthcare industry.[12] The 525 reported breaches reported in 2019 exposed nearly 40 million sensitive records (39,378,157), compared to only 369 breaches that exposed just over 10 million sensitive records (10,632,600) in 2018.[13]

50.     In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including, American Medical Collection Agency (25 million patients, March 2019) University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September

---

[11]   https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed June 1, 2021).
[12] *Id.*
[13] *Id* at 15.

2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

51.     In 2021 alone there were over 220 data breach incidents.[14] These approximately 220 data breach incidents have impacted nearly 15 million individuals.[15]

52.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and *hospitals* are attractive to ransomware criminals… because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[16]

53.     In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[17]

54.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

---

[14] *See* Kim Delmonico, Another (!) Orthopedic Practice Reports Data Breach, Orthopedics This Week (May 24, 2021), https://ryortho.com/breaking/another-orthopedic-practice-reports-data-breach/.

[15] *Id.*

[16] *FBI, Secret Service Warn of Targeted*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited July 2, 2021).

[17] *See* Maria Henriquez, Iowa City Hospital Suffers Phishing Attack, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

## DEFENDANT FAILS TO COMPLY WITH FTC GUIDELINES

55.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

56.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[18] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

57.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

---

[18] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 15, 2021).
[19] *Id.*

58.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

59.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.")

60.     Defendant failed to properly implement basic data security practices.

61.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

62.     Defendant was at all times fully aware of its obligation to protect the PII and PHI of its patients. Defendant was also aware of the significant repercussions that would result from its failure to do so.

## DEFENDANT FAILS TO COMPLY WITH INDUSTRY STANDARDS

63.     As shown above, experts studying cyber security routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

64.     Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data, and; limiting which employees can access sensitive data.

65.     Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

66.     Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

67.     These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

## DEFENDANT'S CONDUCT VIOLATES HIPAA and HITECH AND EVIDENCES ITS INSUFFICIENT DATA SECURITY

68.     HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information.

69. Defendant is a covered entity pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"). *See* 45 C.F.R. § 160.102. Defendant must therefore comply with the HIPAA Privacy Rule and Security Rule. *See* 45 C.F.R. Part 160 and Part 164, Subparts A through E.

70. Defendant is a covered entity pursuant to the Health Information Technology Act ("HITECH")[20]. *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

71. The HIPAA and HITECH rules work in conjunction with the already established laws of privacy Kansas. HIPAA and HITECH do not recognize an individual right of claim for violation but provide the guidelines for the standard of procedure dictating how patient medical information should be kept private.

72. HIPAA's Privacy Rule, otherwise known as "Standards for Privacy of Individually Identifiable Health Information," establishes national standards for the protection of health information.

73. HIPAA's Security Rule, otherwise known as "Security Standards for the Protection of Electronic Protected Health Information," establishes national security standards for the protection of health information that is held or transferred in electronic form. See 42 C.F.R. §§ 164.302-164.318.

74. HIPAA limits the permissible uses of "protected health information" and prohibits the unauthorized disclosure of "protected health information." 45 C.F.R. § 164.502. HIPAA requires that covered entities implement appropriate administrative, technical, and physical safeguards for this information and requires that covered entities reasonably safeguard protected health information from any intentional or unintentional use or disclosure that is

---

[20] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

in violation of the standards, implementation specifications or other requirements of this subpart. *See* 45 C.F.R. § 164.530(c).

75. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

76. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

77. Under HIPAA:

Protected health information means individually identifiable health information:

(1) Except as provided in paragraph (2) of this definition, that is:

(i) Transmitted by electronic media;

(ii) Maintained in electronic media; or

(iii) Transmitted or maintained in any other form or medium.[21]

78. HIPAA and HITECH obligated Defendant to implement technical policies and procedures for electronic information systems that maintain electronic protected health information so that such systems were accessible only to those persons or software programs that had been granted access rights and who have a working need to access and view the information. *See* 45 C.F.R. § 164.312(a)(1); *see also* 42 U.S.C. §17902.

---

[21] 45 C.F.R. § 160.103

79. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

80. HIPAA further obligated Defendant to ensure that its workforce complied with HIPAA security standard rules (*see* 45 C.F.R. § 164.306(a)(4)) to effectively train its workforces on the policies and procedures with respect to protected health information, as necessary and appropriate for those individuals to carry out their functions and maintain the security of protected health information. *See* 45 C.F.R. § 164.530(b)(1).

81. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* US Department of Health & Human Services, Security Rule Guidance Material.[22] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.[23]

---

[22] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html
[23] https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

82. Should a health care provider experience an unauthorized disclosure, it is required to conduct a Four Factor Risk Assessment (HIPAA Omnibus Rule). This standard requires, "A covered entity or business associate must now undertake a four-factor risk assessment to determine whether or not PHI has been compromised and overcome the presumption that the breach must be reported. The four-factor risk assessment focuses on:

> (1) the nature and extent of the PHI involved in the incident (e.g., whether the incident involved sensitive information like social security numbers or infectious disease test results);
>
> (2) the recipient of the PHI;
>
> (3) whether the PHI was actually acquired or viewed; and
>
> (4) the extent to which the risk that the PHI was compromised has been mitigated following unauthorized disclosure (e.g., whether it was immediately sequestered and destroyed)."[24]

83. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires HIPAA covered entities and their business associates to provide notification following a breach of unsecured protected health information.

84. The HIPAA Contingency Operations Rule, 45 C.F.R. §164.301(a), requires a healthcare provider to have security measures in place and train its employees and staff so that all its staff and employees know their roles in facility security.

85.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

---

[24] 78 Fed. Reg. 5641-46, *See also*, 45 C.F.R. §164.304

86.     Had Plaintiffs and the Class Members known Defendant would not honor its own policies and procedures and abide by the federal rules and regulations of privacy they would not have provided their PHI to Defendant and sought treatment elsewhere.

87.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq.* These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

88.     A Data Breach cyberattack such as the one Defendant experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40

89.     Defendant's Data Breach resulted from a combination of its own insufficiencies that demonstrate it failed to comply with safeguards mandated by HIPAA regulations.

## DEFENDANT'S BREACH

90.     Defendant breached its obligations to Plaintiffs and Class Members and was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.   Failing to maintain an adequate data security system to reduce the risk of data breaches, cyber-attacks, hacking incidents, and ransomware attacks;

b.   Failing to adequately protect patients' Private Information;

c.   Failing to properly monitor its own data security systems for existing or prior intrusions;

d.   Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

e.   Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f.   Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

g.   Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

h.   Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

i.   Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

j.   Failing to ensure compliance with HIPAA security standard rules by its workforces in violation of 45 C.F.R. § 164.306(a)(4);

k.    Failing to train all members of its workforces effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b);

l.    Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption");

m.    Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act, and;

n.    Failing to adhere to industry standards for cybersecurity.

91.    As the result of computer systems in need of security upgrades, inadequate procedures for handling email phishing attacks, viruses, malignant computer code, hacking attacks, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and Class Members' Private Information.

92.    Accordingly, as outlined below, Plaintiffs and Class Members now face a present, increased, and immediate risk of fraud and identity theft. In addition, Plaintiffs and the Class Members also lost the benefit of the bargain they made with Defendant because of its inadequate data security practices for which they gave good and valuable consideration.

## CYBERTATTACKS AND DATA BREACHES CAUSE DISRUPTION AND PUT CONSUMERS AT AN INCREASED RISK OF FRAUD AND IDENTITY THEFT

93.     Hacking incidents and data breaches at medical facilities like Defendant's facilities are especially problematic because of the disruption they cause to the medical treatment and overall daily lives of patients affected by the attack.

94.     Researchers have found that at medical facilities that experienced a data security incident, the death rate among patients increased in the months and years after the attack.[25]

95.     Researchers have further found that at medical facilities that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[26]

96.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[27]

97.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's

---

[25] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[26] *See* Sung J. Choi et al., *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Research 971, 971-980 (2019). Available at https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

[27] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (2007). Available at https://www.gao.gov/new.items/d07737.pdf.

identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

98.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[28]

99.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

100.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give

---

[28] See IdentityTheft.gov, Federal Trade Commission, https://www.identitytheft.gov/Steps (last visited Mar. 16, 2021).

the victim's personal information to police during an arrest resulting in an arrest warrant being
issued in the victim's name.

101.    A study by Identity Theft Resource Center shows the multitude of harms caused by
fraudulent use of personal and financial information:[29]



102.    Moreover, theft of Private Information is also gravely serious. PII and PHI is an
extremely valuable property right.[30]

103.    Its value is axiomatic, considering the value of "big data" in corporate America and

---

[29] *See* Jason Steele, *Credit Card and ID Theft Statistics*, CreditCards.com (Oct. 23, 2020)
https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-
1276.php.
[30] *See, e.g.*, John T. Soma, et al, *Corporate Privacy Trend: The "Value" of Personally Identifiable
Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4
(2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching
a level comparable to the value of traditional financial assets.") (citations omitted).

the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

104.    Theft of PHI, in particular, is gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[31]

105.    Drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase PII and PHI on the black market for the purpose of target marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

106.    It must also be noted there may be a substantial time lag – measured in years -- between when harm occurs and when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used.

107.    According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* GAO Report, at p. 29.

---

[31]    *See*    Federal    Trade    Commission,    *Medical    Identity    Theft*, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Mar. 16, 2021).

108.     Private Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

109.     There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

110.     Thus, Plaintiffs and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

111.     Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[32] PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

112.     For example, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for additional credit lines.[33] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security Numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[34] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's

---

[32] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[33] *Identity Theft and Your Social Security Number*, Social Security Administration (2018) at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Mar. 16, 2021).

[34] *Id* at 4.

employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

113.    Moreover, it is not an easy task to change or cancel a stolen Social Security number.

114.    An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[35]

115.    This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[36]

116.    Medical information is especially valuable to identity thieves.

117.    According to account monitoring company LogDog, medical data was selling for $50 and up on the Dark Web.[37]

118.    Because of the value of its collected and stored data, the medical industry has experienced disproportionally higher numbers of data theft events than other industries.

119.    For this reason, Defendant knew or should have known about these dangers and

---

[35] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.

[36] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[37] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

strengthened its network and data security systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

## **PLAINTIFFS' AND CLASS MEMBERS' DAMAGES**

120.    To date, Defendant has done less than nothing to adequately protect Plaintiffs and Class Members, or to compensate them for their injuries sustained in this Data Breach. Defendant's data breach Notice letter completely downplays and disavows the theft of Plaintiffs and Class Members Private Information, when the facts demonstrate that the Private Information was accessed and exfiltrated. The complimentary fraud and identity monitoring service offered by Defendant through IDX is wholly inadequate as the services are only offered for 12 months and it places the burden squarely on Plaintiffs and Class Members by requiring them to expend time signing up for that service, as opposed to automatically enrolling all victims of this cybercrime.

121.    Plaintiffs and Class Members have been injured and damaged by the compromise of their Private Information in the Data Breach.

122.    Plaintiffs' Private Information was compromised in the Data Breach and is now in the hands of the cybercriminals who accessed Defendant's IT network. Class Members' PII and PHI, as described above, was similarly compromised and is now in the hands of the same cyberthieves.

123.    Plaintiffs are former and current patients of Defendant.

124.    Plaintiffs typically takes measures to protect their Private Information, and are very careful about sharing their PII and PHI. Plaintiffs have never knowingly transmitted unencrypted PII or PHI over the internet or any other unsecured source.

125.    Plaintiffs stores any documents containing their PII and PHI in a safe and secure location. Moreover, they diligently choose unique usernames and passwords for their online accounts.

126.    As a result of the Data Breach, Plaintiffs made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; and researching credit monitoring and identity theft protection services offered by Defendant. Plaintiffs has spent five to six hours dealing with the Data Breach, valuable time Plaintiffs otherwise would have spent on other activities, including but not limited to work and/or recreation. Moreover, this time was spent at Defendant's direction. Defendant's Notice letter expressly advised Plaintiffs to spend time mitigating their damages, including, for example, "reviewing your account statements for fraudulent or irregular activity".

127.    As a result of the Data Breach, Plaintiffs has suffered anxiety as a result of the release of their Private Information, which they believed would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using her Private Information for purposes of identity theft and fraud. Plaintiffs are very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

128.    Plaintiffs suffered actual injury from having their Private Information compromised as a result of the Data Breach including, but not limited to (a) damage to and diminution in the value of their Private Information, a form of property that Defendant obtained from Plaintiffs; (b) violation of their privacy rights; and (c) present, imminent and impending injury arising from the increased risk of identity theft and fraud.

129.    Plaintiffs have also experienced a substantial increase in suspicious and "spam" telephone calls and emails since the Data Breach. Plaintiffs believe these suspicious telephone calls and emails to be a result of the Data Breach and that they are being placed for the purpose

of a reverse social engineering attack, a type of attack where the attacker approaches the target directly.

130.    As a result of the Data Breach, Plaintiffs anticipate spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. As a result of the Data Breach, Plaintiffs are at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

131.    Plaintiffs and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical fraud, insurance fraud, tax return fraud, utility bills opened in their names, and similar identity theft.

132.    Defendant has admitted Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

133.    Plaintiffs and Class Members will also incur out-of-pocket costs for protective measures such as credit monitoring fees (for any credit monitoring obtained in addition to or in lieu of the inadequate monitoring offered by Defendant), credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

134.    Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by the hacker and cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

135.    Plaintiffs and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiffs and Class Members overpaid for a service that was intended to be accompanied by adequate data security but was not. Part of the price Plaintiffs and Class Members paid to

Defendant was intended to be used by Defendant to fund adequate security of Defendant's computer property and protect Plaintiffs' and Class Members' Private Information. Thus, Plaintiffs and the Class Members did not get what they paid for.

136.   Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial and medical accounts and records for misuse.

137.   Plaintiffs and Class Members have suffered actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    i.   Finding fraudulent loans, insurance claims, tax returns, and/or government benefit claims;

    ii.   Purchasing credit monitoring and identity theft prevention;

    iii.   Placing "freezes" and "alerts" with credit reporting agencies;

    iv.   Spending time on the phone with or at a financial institution or government agency to dispute fraudulent charges and/or claims;

    v.   Contacting financial institutions and closing or modifying financial accounts;

    vi.   Closely reviewing and monitoring Social Security Number, medical insurance accounts, bank accounts, and credit reports for unauthorized activity for years to come.

138.   Moreover, Plaintiffs and Class Members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not

limited to, making sure that the storage of data or documents containing sensitive and confidential personal, health, and/or financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

139.    Further, as a result of Defendant's conduct, Plaintiffs and Class Members are forced to live with the anxiety that their Private Information may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

140.    As a direct and proximate result of Defendant's actions and inactions, Plaintiffs and Class Members have suffered a loss of privacy and are at a present, imminent and increased risk of future harm.

## V.    CLASS ALLEGATIONS

141.    Pursuant to KS Stat. § 60-223, Plaintiffs brings this class action as a class action on behalf of herself and the following similarly situated persons:

**Class Definition.** All persons whose Private Information was compromised in the Data Breach and were sent a notice of the Data Breach from the Defendant.

142.    On information and belief, the putative Class is comprised of hundreds, if not thousands, of individuals making joinder impracticable. Disposition of this matter as a class action will provide substantial benefits and efficiencies to the Parties and the Court.

143.    The rights of Plaintiffs and each other Class Member were violated in a virtually identical manner as a direct and/or proximate result of Defendant's willful, reckless and/or negligent actions and/or inaction and the resulting breach.

144.    Questions of law and fact common to all Class Members exist and predominate over questions affecting individual Class Members, including, *inter alia*:

> a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the hacking incident and Data Breach;

c.  Whether Defendant's data security systems prior to and during the hacking incident and Data Breach complied with applicable data security laws and regulations, *e.g.*, HIPAA;

d.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.  Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.  Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.  Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.  Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.  Whether Defendant owed a duty to provide Plaintiffs and Class Members notice of this Data Breach, and whether Defendant breached that duty to provide timely notice;

j.  Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

k.  Whether Defendant's conduct was negligent;

l.  Whether Defendant's conduct was *per se* negligent;

m.  Whether Defendant's acts, inactions, and practices complained of herein amount to acts of intrusion upon seclusion under the law;

n.  Whether Defendant was unjustly enriched;

o.  Whether Defendant's conduct violated federal law;

p.  Whether Defendant's conduct violated state law;

q.  Whether Plaintiffs and Class Members are entitled to damages, civil penalties, and/or punitive damages.

145.  Plaintiffs and their counsel will fairly and adequately represent the interests of the other Class Members. Plaintiffs have no interests antagonistic to, or in conflict with, the other Class Members' interests. Plaintiffs' counsel is highly experienced in the prosecution of medical and consumer class action data breach cases.

146.  Plaintiffs' claims are typical of the other Class Members' claims that Plaintiffs' claims and the other Class Members' claims all arise from Defendant's failure to properly safeguard and protect their Private Information.

147.  A class action is superior to all other available methods for fairly and efficiently adjudicating Plaintiffs' and other Class Members' claims. Plaintiffs and the other Class Members have been harmed as a result of Defendant's wrongful actions and/or inaction and the resulting breach. Litigating this case as a class action will reduce the possibility of repetitious litigation relating to Defendant's conduct.

148.  Class certification, therefore, is appropriate under K.S.A. § 60-223(2) because the above common questions of law predominate over any questions affecting individual Class Members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

149.    Class certification is also appropriate pursuant to K.S.A. § 60-223(b)(2) because Defendant has acted or refused to act on grounds applicable to the whole Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

150.    The expense and burden of litigation would substantially impair the ability of Class Members to pursue individual lawsuits in order to vindicate their rights. Absent a class action. Defendant will retain the benefits of its wrongdoing despite serious violations of the law.

## VI.    CAUSES OF ACTION

## COUNT I

## NEGLIGENCE

151.    Plaintiffs re-alleges and incorporates by reference all previous paragraphs as if fully set forth herein. Plaintiffs brings this claim individually and on behalf of all Class Members.

152.    In order to receive medical treatments and services and/or as a condition of employment, Defendant and/or its agents required Plaintiffs and Class Members to submit non-public Private Information, such as PII and PHI.

153.    Plaintiffs and Class Members entrusted their Private Information to Defendant and/or its agents with the understanding that Defendant would safeguard their information.

154.    By collecting and storing this data in its computer property, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

155.     Defendant owed a duty of care to safeguard the Private Information of Plaintiffs and Class Members in its custody. This duty of care arises because Defendant knew of a foreseeable risk to the data security systems it used. Defendant knew of this foreseeable risk because of the explosion of data breach incidents involving healthcare providers detailed above. Despite its knowledge of this foreseeable risk, Defendant failed to implement reasonable security measures.

156.     Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

157.     Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its client patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

158.     Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530©(1).

159.     Some or all of the information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

160.     In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . .

practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

161.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

162.    Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

      a.     Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

      b.     Failing to adequately monitor the security of their networks and systems;

      c.     Failure to periodically ensure that their network system had plans in place to maintain reasonable data security safeguards;

      d.     Allowing unauthorized access to Class Members' Private Information;

      e.     Failing to detect in a timely manner that Class Members' Private Information had been compromised;

      f.     Failing to timely notify Class Members about the Data Breach regarding what type of Private Information had been compromised so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

      g.     Failing to have mitigation and back-up plans in place in the event of a data breach.

163.    It was foreseeable that Defendant's failure to use reasonable measures to protect

Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of hacking incidents, cyberattacks, and data breaches in the healthcare industry.

164.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

165.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

## COUNT II

## BREACH OF IMPLIED CONTRACT

166.    Plaintiffs re-alleges and incorporates by reference all previous paragraphs as if fully set forth herein. Plaintiffs brings this claim individually and on behalf of all Class Members.

167.    Through their course of conduct, Defendant, Plaintiffs, and Class Members entered into implied contracts for the provision of medical care and treatment and/or the provision of labor services, as well as implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' Private Information.

168.    Defendant solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

169.    Defendant manifested its intent to enter into an implied contract that included a contractual obligation to reasonably protect Plaintiffs' and Class Members' Private Information.

170.    The valid and enforceable implied contracts to provide medical health care services and/or labor services that Plaintiffs' and Class Members entered into with Defendant and/or its

Agents include the promise to protect non-public Private Information given to Defendant or that Defendant creates on its own from disclosure.

171.    When Plaintiffs and Class Members provided their Private Information to Defendant in exchange for medical services, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

172.    In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

173.    Plaintiffs and Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

174.    Under the implied contracts, Defendant promised and was obligated to: (a) provide healthcare services and/or employment to Plaintiffs and Class Members; and (b) protect Plaintiffs' and the Class Members' PII/PHI: (i) provided to obtain such health care or employment; and/or (ii) created as a result of providing such health care and/or employment. In exchange, Plaintiffs and Members of the Class agreed to pay money for these services, and/or provide their labor and to turn over their Private Information.

175.    Both the provision of healthcare and/or employment and the protection of Plaintiffs' and Class Members' Private Information were material aspects of these implied contracts.

176.    On information and belief, the implied contracts for the provision of medical services and/or labor services – contracts that include the contractual obligations to maintain the privacy of Plaintiffs' and Class Members' Private Information—are also believed to be

acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's Privacy Notice (or other privacy policy-type document).

177.    On information and belief, Defendant's express representations, including, but not limited to the express representations found in its Privacy Notice, memorialize and embody the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiffs' and Class Members' Private Information.

178.    Consumers of healthcare and employees value their privacy and the ability to keep their Private Information associated with obtaining healthcare private. To customers such as Plaintiffs and Class Members, healthcare that does not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security.

179.    Plaintiffs and Class Members would not have entrusted their Private Information to Defendant and/or its Agents and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected, or entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

180.    A meeting of the minds occurred, as Plaintiffs and Members of the Class agreed to and did provide their Private Information to Defendant and/or its Agents, and paid for the provided healthcare in exchange for, amongst other things, both the provision of health care and medical services and the protection of their Private Information.

181.    Plaintiffs and Class Members performed their obligations under the contract when they paid for their health care services and provided their Private Information.

182.     Defendant materially breached its contractual obligation to protect the non-public Private Information Defendant gathered when the sensitive information was accessed by unauthorized personnel as part of the hacking incident and Data Breach.

183.     Defendant materially breached the terms of the implied contracts. Defendant did not maintain the privacy of Plaintiffs and Class Members' Private Information as evidenced by its notifications of the Data Breach to Plaintiffs and hundreds, if not thousands, of Class Members. In particular, Defendant did not comply with industry standards, standards of conduct embodied in statutes like HIPAA and Section 5 of the FTCA, or otherwise protect Plaintiffs and the Class Members' Private Information, as set forth above.

184.     The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

185.     As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiffs and Members of the Class did not receive the full benefit of the bargain, and instead received health-care and other medical services that were of a diminished value to that described in the contracts. Plaintiffs and Class Members therefore were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the health care they received.

186.     Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

187.     As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries,

including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

188.    Plaintiffs and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the hacking incident and Data Breach.

**COUNT III**

**UNJUST ENRICHMENT**

**(Alternatively to Count II)**

189.    Plaintiffs re-alleges and incorporates by reference all of the preceding paragraphs as if fully set forth herein. Plaintiffs brings this claim individually and on behalf of all Class Members. This count is plead in the alternative to the breach of implied contract count above.

190.    Plaintiffs and Class Members conferred a benefit on Defendant with their money or labor services. Specifically, they purchased goods and services from Defendant and/or provided their labor and in so doing also provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

191.    Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

192.    In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs and Class Members' Personal

Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

193.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

194.    Defendant failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

195.    Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

196.    If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have agreed to provide their Private Information to Defendant.

197.    Plaintiffs and Class Members have no adequate remedy at law.

198.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (a) actual identity theft; (b) the loss of the opportunity of how their Private Information is used; (c) the compromise, publication, and/or theft of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity

addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Private Information in their continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

199.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

200.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**COUNT IV**
**INVASION OF PRIVACY BY PUBLIC DISCLOSURE OF PRIVATE FACTS**

201.    The preceding factual statements and allegations are incorporated herein by reference.

202.    Plaintiffs' and the other Class Members' PHI and PII was (and continues to be) sensitive and personal private information.

203.    By virtue of Defendant's failure to safeguard and protect Plaintiffs' and the other Class Members' PHI and PII and the resulting Breach, Defendant wrongfully disseminated Plaintiffs' and the other Class Members' PHI and PII to unauthorized persons.

204.    Dissemination of Plaintiffs' and the other Class Members' PHI and PII is not of a legitimate public concern; publicity of their PHI and PII was, is and will continue to be offensive to Plaintiff, the other Class Members and all reasonable people. The unlawful disclosure of same violates public mores.

205.    As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential medical information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

206.    Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to:  (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PHI and PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages.

207.    Defendant's wrongful actions and/or inaction and the resulting Breach (as described above) constituted (and continue to constitute) an invasion of Plaintiffs' and the other Class Members' privacy by publicly and wrongfully disclosing their private facts (*i.e.*, their PHI and PII) without their authorization or consent.

### COUNT V
### BREACH OF FIDUCIARY DUTY OF CONFIDENTIALITY

208.    The preceding factual statements and allegations are incorporated herein by

reference.

209.    At all times relevant hereto, Defendant owed, and owes, a fiduciary duty to Plaintiffs and the proposed class pursuant to Kansas common law, to keep Plaintiffs' medical and other PHI and PII information confidential.

210.    The fiduciary duty of privacy imposed by Kansas law is explicated under the procedures set forth in the Health Insurance Portability and Accountability Act Privacy Rule, including, without limitation the procedures and definitions of 45 C.F.R. §160.103 and 45 C.F.R. §164.530 which requires a covered entity, health care provider, to apply appropriate administrative, technical, and physical safeguards to protect the privacy of patient medical records.

211.    Defendant breached its fiduciary duty to Plaintiffs by disclosing Plaintiffs and the other Class Members PHI and PII to unauthorized third parties.

212.    As a direct result of Defendant's breach of fiduciary duty of confidentiality and the disclosure of Plaintiffs' confidential medical information, Plaintiffs and the proposed Class Members suffered damages.

213.    As a direct result of Defendant's breach of its duty of confidentiality and privacy and the disclosure of Plaintiffs' and the member of the Class confidential medical information, Plaintiffs and the members of the Class suffered damages, including, without limitation, loss of the benefit of the bargain, exposure to heightened future risk of identity theft, loss of privacy, confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

214.    Plaintiffs and the other Class Members suffered and will continue to suffer damages including, but not limited to:  (i) the untimely and/or inadequate notification of the Breach; (ii) improper disclosure of their PHI and PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the

Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and, (vii) emotional distress. At the very least, Plaintiffs and the other Class Members are entitled to nominal damages

## COUNT VI
## OUTRAGEOUS CONDUCT

215.    Plaintiffs incorporates by reference the allegations of the foregoing paragraphs as though set forth fully herein.

216.    At all times relevant hereto, Defendant owes a duty to Plaintiffs to keep patient medical information private, and not reveal patient medical information to third parties without first obtaining the patient's expressed consent.

217.    Defendant disclosed Plaintiffs' highly sensitive private medical information to the public either intentionally or with reckless disregard for Plaintiff.

218.    Defendant's conduct was extreme and outrageous and caused Plaintiffs extreme and severe mental distress.

219.    As a direct result of Defendant's actions Plaintiffs suffered harms, including, without limitation, loss of her privacy, emotional distress, lost medical expenses, embarrassment, humiliation, shame and loss of enjoyment of life.

## VII.    PRAYER FOR RELIEF

**WHEREFORE, Plaintiff, on their own and behalf of all others similarly situated, pray for relief as follows:**

A. For an Order certifying this case as a class action and appointing Plaintiffs and their counsel to represent the Class;

B.  For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined, as allowable by law;

C. D. For injunctive and other equitable relief to ensure the protection of the sensitive information of Plaintiffs and the class which remains in Defendant's possession.

E.  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

F.  Pre- and post-judgment interest on any amounts awarded; and

G.  Such other and further relief as the Court may deem just and proper.

## VIII.   JURY TRIAL DEMAND

220.    Plaintiffs hereby demands a trial by jury of all claims so triable.


Respectfully submitted,

Maureen M. Brady
_____
Maureen M. Brady     KS #22460
Lucy McShane         KS #22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone:  (816) 888-8010
Facsimile:  (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
        lmcshane@mcshanebradylaw.com



s/     Gary Klinger
_____

Gary M. Klinger*
**MILBERG COLEMAN BRYSON**

**PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street
Suite 2100
Chicago, IL 60606
Tel.:    (866) 252-0878
Email: gklinger@milberg.com

**ATTORNEYS FOR PLAINTIFFS**

ELECTRONICALLY FILED
2022 Jun 09 AM 11:49
CLERK OF THE LABETTE-PARSONS DISTRICT COURT
CASE NUMBER: LBP-2022-CV-000031
PII COMPLIANT

**IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS**

| | |
|---|---|
| D.H., individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| **LABETTE HEALTH** Serve: Spenserv, Inc. 6201 College Blvd. Suite 500 Overland Park, Kansas 66211 | ) ) ) ) ) ) ) |
| Defendant. | |

Case No:
Division:

## DEMAND FOR JURY TRIAL

**COMES NOW** Plaintiff, on behalf of herself and the other Class Members, respectfully demands a trial by jury on all of her claims and causes of action so triable.

Respectfully submitted,

Maureen M. Brady        KS #22460
Lucy McShane            KS #22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone:  (816) 888-8010
Facsimile:  (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
        lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFFS**

ELECTRONICALLY FILED
2022 Jun 09 AM 11:49
CLERK OF THE LABETTE-PARSONS DISTRICT COURT
CASE NUMBER: LBP-2022-CV-000031
PII COMPLIANT

## IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS

| | |
|---|---|
| **D.H., individually and on behalf of all**<br>**others similarly situated,** | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No: |
| | ) Division: |
| **LABETTE HEALTH** | ) |
| Serve: | ) |
| Spenserv, Inc. | ) |
| 6201 College Blvd. | ) |
| Suite 500 | ) |
| Overland Park, Kansas 66211 | ) |
| | ) |
| Defendant. | |

### DESIGNATION OF LEAD COUNSEL

**COMES NOW** Plaintiff D.H. hereby designates Lucy McShane of the law firm of

McShane & Brady, LLC, as lead counsel in the above-referenced matter.

Respectfully submitted,

*[signature]*

_____
Maureen M. Brady     KS# 22460
Lucy McShane        KS# 22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Phone: (816) 888-8010
Fax: (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
        lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFF**

ELECTRONICALLY FILED
2022 Jun 09 AM 11:49
CLERK OF THE LABETTE-PARSONS DISTRICT COURT
CASE NUMBER: LBP-2022-CV-000031
PII COMPLIANT

## IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS

| | |
|---|---|
| D.H., individually and on behalf of all others similarly situated, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | )   Case No:<br>)   Division: |
| LABETTE HEALTH<br>Serve:<br>Spenserv, Inc.<br>6201 College Blvd.<br>Suite 500<br>Overland Park, Kansas 66211 | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendant. | |

### ENTRY OF APPEARANCE

**COMES NOW** Lucy McShane of the law firm of McShane & Brady, LLC, and hereby

enters her appearance as counsel on behalf of Plaintiff D.H. in the above-referenced matter.

Respectfully submitted,

*Lucy McShane*

Maureen M. Brady     KS# 22460
Lucy McShane     KS# 22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Phone:  (816) 888-8010
Fax:  (816) 332-6295
E-mail:  mbrady@mcshanebradylaw.com
            lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFF**

ELECTRONICALLY FILED
2022 Jun 09 AM 11:49
CLERK OF THE LABETTE-PARSONS DISTRICT COURT
CASE NUMBER: LBP-2022-CV-000031
PII COMPLIANT

**IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS**

| | | |
|---|---|---|
| **D.H., individually and on behalf of all others similarly situated,** | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No: Division: |
| **LABETTE HEALTH** Serve: **Spenserv, Inc. 6201 College Blvd. Suite 500 Overland Park, Kansas 66211** | ) ) ) ) ) ) ) ) | |
| Defendant. | | |

## ENTRY OF APPEARANCE

**COMES NOW** Maureen M. Brady of the law firm of McShane & Brady, LLC, and hereby

enters her appearance as counsel on behalf of Plaintiff D.H. in the above-referenced matter.

Respectfully submitted,

*Maureen M. Brady*

Maureen M. Brady      KS# 22460
Lucy McShane          KS# 22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Phone:  (816) 888-8010
Fax:  (816) 332-6295
E-mail:  mbrady@mcshanebradylaw.com
         lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFF**

ELECTRONICALLY FILED
2022 Jun 09 AM 11:49
CLERK OF THE LABETTE-PARSONS DISTRICT COURT
CASE NUMBER: LBP-2022-CV-000031
PII COMPLIANT

**IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS**

| | |
|---|---|
| D.H., individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| LABETTE HEALTH | ) |
| Serve: | ) |
| Spenserv, Inc. | ) |
| 6201 College Blvd. | ) |
| Suite 500 | ) |
| Overland Park, Kansas 66211 | ) ) |
| Defendant. | |

Case No:
Division:

**MOTION AND ORDER FOR**
**APPROVAL AND APPOINTMENT OF PRIVATE PROCESS SERVER**

COMES NOW Plaintiff, by and through its attorney of record, and for its Motion for

Approval/Appoint of Private Process Server, and requests that D&B Legal Services, Inc.: Legal

Names (s): who are qualified persons to serve process, are not parties and are not less than eighteen

(18) years of age, as private process servers in the above cause to serve process in this case.

| | | |
|---|---|---|
| Jamie Andrews PPS21-0022 | Maureen Dice PPS21-0033 | Tawanda Johnson PPS21-0048 |
| Sallie Bailey PPS21-0023 | Norman Diggs PPS21-0125 | Patrick Jones PPS21-0049 |
| Brian Bankowski PPS21-0099 | Edwina Ditmore PPS21-0126 | Wendy Hilgenberg PPS21-0050 |
| Dustin Becraft PPS21-0024 | William Ferrell PPS21-0034 | Brent Kirkhart PPS21-0051 |
| Carrington Bell PPS21-0025 | Robert Finley PPS21-0035 | Janice Kirkhart PPS21-0052 |
| Miranda Bergner PPS21-0101 | Ramona Foster PPS21-0132 | Tyler Kirkhart PPS21-0053 |
| Steven Bergner PPS21-0026 | James Frago PPS21-0036 | Raymond Land PPS21-0162 |
| Thomas Bogue PPS21-0027 | John Frago PPS21-0037 | Bert Lott PPS21-0054 |
| Mathew Bohrer PPS21-0103 | David Garza PPS21-0134 | Frank Lundien PPS21-0168 |
| Arthur Boyer PPS21-0028 | Bradley Gordon PPS21-0038 | Chad Maier PPS21-0170 |
| Scott Brady PPS21-0029 | Thomas Gorgen PPS21-0039 | Kenneth Marshall PPS21-0171 |
| Donald Branda PPS21-0104 | Mason Gray PPS21-0140 | Deborah Martin PPS21-0055 |
| Jeff Brown PPS21-0030 | Charles Gunning PPS21-0040 | Michael Martin PPS21-0056 |
| Randy Burrow PPS21-0107 | Michael Hancock PPS21-0041 | Timothy McLleary PPS21-0057 |
| Gary Burt PPS21-0031 | James Hannah PPS21-0042 | Michael Meador PPS21-0058 |
| Glen Cobb PPS21-0114 | Rufus Harmon PPS21-0043 | Maria Meier PPS21-0059 |
| Norman Collins PPS21-0115 | Stephen Heitz PPS21-0044 | Heather Merfen PPS21-0060 |
| Michael Conklin PPS21-0120 | James Hise PPS21-0045 | Thomas Melte PPS21-0061 |
| Lisa Corbett PPS21-0122 | William Hockersmith PPS21-0046 | Jill Miller PPS21-0178 |
| David Dice PPS21-0032 | Mike Johnson PPS21-0047 | Michael Miller PPS21-0062 |

1

Matthew Millhollin PPS21-0063
Jason Moody PPS21-0064
Jeremy Nicholas PPS21-0065
Michael Noble PPS21-0066
Greg Noll PPS21-0067
Robert Peters PPS21-0193
Carrie Pfeifer PPS21-0068
Craig Poese PPS21-0069
Dee Powell PPS21-0070
Samantha Powell PPS21-0071
William Powell PPS21-0072
Kim Presler PPS21-0073
Marcus Presler PPS21-0074
Mark Rauss PPS21-0075

Jason Rodgers PPS21-0076
Richard Roth PPS21-0077
Edna Russell PPS21-0078
Juan Santos PPS21-0207
Brian Scheer PPS21-0208
Brenda Schiwitz PPS21-0079
Mark Schneider PPS21-0209
Joe Sherrod PPS21-0212
Michael Siegel PPS21-0213
Robert Simpson PPS21-0214
Laura Skinner PPS21-0080
Thomas Skinner PPS21-0081
Richard Skyles PPS21-0082
Anthony Spada PPS21-0083

John Stotler PPS21-0220
Randy Stone PPS21-0219
Sonja Stone PPS21-0218
Lucas Traugott PPS21-0223
Ryan Weekley PPS21-0084
Misty Wege PPS21-0230
Andrew Wheeler PPS21-0085
Pamela Wheetley PPS21-0086
Andrew Wickliffe PPS21-0087
Gregory Willing PPS21-0088
Conni Wilson PPS21-0089
Stan Yoder PPS21-0233
Jacqueline Young PPS21-0090
Greg Zotta PPS21-0091

Respectfully submitted,

_Maureen M. Brady_

---

Maureen M. Brady     KS #22460
Lucy McShane         KS #22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone: (816) 888-8010
Facsimile: (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
        lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFFS**

## **ORDER**

It is hereby ordered that the Plaintiff's Motion for Approval and Appointment of private process server is sustained, and the above-named individual is hereby approved and appointed to serve process in the above-captioned matter.

IT IS HEREBY ORDERED.


DATE: _____          _____

                                              Judge of the District Court

ELECTRONICALLY FILED
2022 Jun 09 AM 11:49
CLERK OF THE LABETTE-PARSONS DISTRICT COURT
CASE NUMBER:  LBP-2022-CV-000031
PII COMPLIANT

**IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS**

| | |
|---|---|
| D.H., individually and on behalf of all others similarly situated,      )<br>  )<br>  )<br>Plaintiffs,   )<br>  )<br>v.   )<br>  )<br>**LABETTE HEALTH**   )<br>Serve:   )<br>Spenserv, Inc.   )<br>6201 College Blvd.   )<br>Suite 500   )<br>Overland Park, Kansas 66211   )<br>  ) | Case No:<br>Division: |

Defendant.

## <u>MOTION TO KEEP THE IDENTITY OF PLAINTIFF PRIVATE</u>

**COMES NOW** Plaintiff, by and through counsel, and for her Motion to keep her identity private throughout the course of this litigation.  In support of her Motion, Plaintiff states as follows:

1.      Plaintiff is a private citizen who was a patient at Defendant's medical center.

2.      Defendant was under a duty pursuant to state and federal law to keep Plaintiff's medical records, including her identity, confidential and protect against the publication of her private information, including her identity.

3.      On or about October 15, 2021 to October 24, 2021 Defendant violated its duty and released Plaintiff's medical information to the public.

4.      As a result of Defendant's actions, Plaintiff has filed the instant litigation.

5.      Defendant's actions have already caused Plaintiff permanent and irreparable harm to her privacy.

1

6.    Ongoing and further harm would be done to Plaintiff if she were forced to reveal her identity in the course of this litigation which would trigger further association to cases pending throughout the State of Kansas.

7.    No prejudice will befall Defendant to maintain Plaintiff's privacy throughout this litigation as Defendant has a continuing duty to maintain Plaintiff's privacy which is not alleviated by the filing of this suit.

WHEREFORE, Plaintiff respectfully requests this Court to order that Plaintiff's identity remain private throughout this litigation and for such further orders as the Court deems necessary under the circumstances.

Respectfully submitted,

*Maureen M. Brady*

Maureen M. Brady       KS #22460
Lucy McShane             KS #22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone:  (816) 888-8010
Facsimile:  (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
             lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFFS**



**ELECTRONICALLY FILED**
2022 Jun 09 PM 2:59
CLERK OF THE LABETTE-PARSONS DISTRICT COURT
CASE NUMBER: LBP-2022-CV-000031
PII COMPLIANT



**Court:**          Labette-Parsons District Court

**Case Number:**    LBP-2022-CV-000031

**Case Title:**     D H, et al
                    vs.
                     Labette County Hospital

**Type:**           Proposed order to keep Plaintiffs identity private


SO ORDERED.

/s/ Fred W. Johnson, District Court Judge


Electronically signed on 2022-06-09 14:59:49    page 1 of 3

## IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS

| | |
|---|---|
| D.H., individually and on behalf of all<br>others similarly situated, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Case No: |
| | )    Division: |
| **LABETTE HEALTH** | ) |
| Serve: | ) |
| Spenserv, Inc. | ) |
| 6201 College Blvd. | ) |
| Suite 500 | ) |
| Overland Park, Kansas 66211 | ) |
| | ) |
| Defendant. | |

### ORDER

On this ____ day of _____, 2022 this matter is brought before the Court on

Plaintiff's Motion to Keep Plaintiff's Identity Private. Now having reviewed the Motion and being

fully advised in the premises the Court hereby GRANTS Plaintiff's Motion.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Plaintiff's Identity

will be kept private and within the confines of this litigation and that her name shall not be used in

any pleadings or other documents filed with the Court.

Date: _____        _____
                                              Judge of the District Court

Respectfully submitted,

*Maureen M. Brady*

---

Maureen M. Brady      KS #22460
Lucy McShane          KS #22517
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Telephone:  (816) 888-8010
Facsimile:  (816) 332-6295
E-mail:  mbrady@mcshanebradylaw.com
          lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFFS**

## IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS

| | |
|---|---|
| D.H., individually and on behalf of all<br>others similarly situated,<br><br>      Plaintiffs,<br><br>      v.<br><br>LABETTE HEALTH FOUNDATION,<br>INC.<br>Serve:<br>Spenserv, Inc.<br>6201 College Blvd.<br>Suite 500<br>Overland Park, Kansas 66211<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No:<br>)  Division:<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' FIRST REQUEST FOR PRODCUTION OF DOCUMENTS TO DEFENDANT

**COMES NOW** Plaintiff, by and through counsel, and pursuant to Rule 57.01, Missouri Rules of Civil Procedure, hereby respectfully requests that Defendant Labette Health, (herein after either "Defendant" or "LH") respond to the following requests within forty-five (45) days from the date of service of these requests for production of documents.

## DEFINITIONS AND INSTRUCTIONS

1.      "Document" or "documents" means any and all information in tangible form and shall include, without limiting, the generality of the foregoing, all letters, telegrams, telexes, telegraphs, correspondence, contracts, leases, drafts, agreements, notes to file, reports, memoranda, mechanical or electrical recordings or transcripts of such recordings, information stored on computers, blueprints, flow sheets, calendar or diary entries, memoranda of telephone or personal conversations, memoranda of meetings or conferences, studies, reports, interoffice and intra-office communications, quotations, inquiries, analyses, offers, circulars, statements, manuals,

summaries, newsletters, compilations, maps, electronic mail, computer files or records stored in electronic media, charts, graphs, propositions, articles, announcements, newspaper clippings, books, records, videotapes, films, tables, books of account, ledgers, vouchers, canceled checks, invoices, bills, opinions, certificates, promissory notes and other evidence of indebtedness and all drafts and copies of documents as hereinabove defined by whatever means made.  If multiple copies of a document exist, each copy that is in any way not completely identical to a copy that is being produced should also be identified.

2.      "Communication" refers to any transmission or transfer of information of any kind, whether orally, in writing or in any other medium at any time or place and under any circumstances whatsoever.

3.      "Person" means any individual, corporation, partnership, joint venture, group, association or other organization.

4.      "Referring" or "relating to" means constituting, respecting, reflecting, concerning, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing or evaluating.

5.      "Produce" means make available for inspection and copying all documents responsive to each category of these requests in your possession, custody or control, regardless of the source of the documents.

6.      The documents produced should be organized and labeled to correspond with the categories in these requests.  All documents produced should be your originals, unless otherwise indicated.  If your "original" is a photocopy (or copy), then the photocopy should be produced as the original.

7.      If you possess no documents responsive to a request or portion of a request, state

this fact, specifying the request or paragraph to which you contend responsive documents do not exist.

      8.     If you object to producing any document in your possession, custody or control based upon any claim of privilege or immunity, as to each document or category of documents that you are withholding from production:

        a.   State the precise privilege or immunity you claim and the factual and/or legal bases for asserting the privilege as to the document(s);

        b.   State the date of the document(s); its type (e.g., correspondence, memorandum, etc.) and the name of each author, sender, addressee, and/or recipient;

        c.   Describe the content of the document(s) sufficiently to enable the Court to rule on the propriety of the privilege or immunity you are asserting;

        d.   State the location of the document(s);

        e.   State the location of the custodian of the document(s).

      9.     "You" or "your" means the party to whom these requests are addressed and your elected or appointed officials, officers, directors, employees, agents, servants, representatives or anyone else acting on your behalf.

      10.    As used herein, the term "defendant" shall include all of your subsidiaries, relating companies, entities, divisions, affiliates and agencies.

      11.    As used herein, the term "company policy/procedural manual" is intended to have a broad reference to all forms of recorded information, including writings, publications, whether electronic or hard copy, covering subjects including, but not limited to, training, hiring, supervising, qualifying, discipline, awards, rewards, reviews, promotion, demotion, and administration available to or utilized by any employee of this defendant.

12.     As used herein, the term "LH" means Defendant Labette Health.

13.     As used herein, "the Disclosure(s)" means the alleged disclosure of plaintiff's private health information by LH or any other of its agents, employees, servants, or representatives to anyone who is not an agent, employee, servant, or representative of LH.

14.     If, in responding to any request, you perceive any ambiguity in construing either the request, instruction, or definition relevant to the request, set forth the matter deemed ambiguous and the construction chosen or used in answering the request.

15.     Each request shall be deemed continuing so as to require prompt supplemental responses if documents called for are obtained, discovered, or created subsequent to the time of responding to these requests.

## REQUESTS FOR PRODUCTION

1.  All documents reflecting or relating to knowledge, information, or the investigation of the Disclosure(s) of the protected health information ("PHI") and personal identification information ("PII") that is subject of Plaintiff's Petition.

2.  All statements, whether oral, written, recorded, transcribed, summarized, or otherwise memorialized, of any witness or other individual purporting to have knowledge of any issue that is subject of Plaintiff's Petition.

3.  All documents indicating the types of information that was disclosed regarding the disclosure of the PHI and PII that is the subject of Plaintiff's Petition.

4.  All documents reflecting or relating to any and all policies or procedures on protection of your patient and their guardian's protected health information ("PHI") and personal identification information ("PII") from 2014 to the present.

5.  Copies of any contracts and/or agreements between you and any patients, their guardians or third parties regarding the protection of your employees' protected health information ("PHI") and personal identification information ("PII") from 2014 to the present.

6.  Copies of all privacy policies and/or related documents regarding the protection of your patient or their guardian's protected health information ("PHI") and personal identification information ("PII") from 2014 to the present.

7.  All documents identified in your answers, or relied upon in preparing your answers, to

Plaintiff's First Set of Interrogatories to Defendant.

8. All documents reflecting or relating to any contract, agreement, or other relationship between Defendant and any company, person, or entity hired to maintain the PHI and PII records for patients and/or their guardians of LH.

9. All documents reflecting or relating to knowledge, information, or investigation of the Disclosure(s) subject of Plaintiff's Petition.

10. All documents relating to any contention you have that any other person or entity is responsible, in any way whatsoever, for disclosing Plaintiff's PHI and PII information.

11. All documents relating to any contention that some other person or entity is, in whole or in part, liable to Plaintiff in this matter or is liable, in whole or in part, to Defendant in this matter.

12. Any and all indemnity agreements which might cover, address or concern Defendant's liability to Plaintiff regarding the allegations in Plaintiff's Petition.

13. All documents reflecting or relating to training your agents, employees, servants, and/or representatives on protection of PHI and PII information and the duties imposed by HIPAA from 2014 to the present.

14. All documents reflecting or relating to supervising your agents, employees, servants, and/or representatives to ensure protection of PHI and PII information from 2014 to the present.

15. All documents reflecting or relating to any and all policies or procedures on protection of PHI and PII information from 2014 to the present.

16. All documents as a result of any claim made by any other person or entity other than the Plaintiff herein regarding wrongful disclosure of PHI and PII information in the last 10 years.

17. All documents related to any wrongful disclosure of PHI and PII information in the last 5 years.

18. All documents reflecting or relating to disciplinary procedures for your employees, agents, servants, and/or representatives who improperly disclose PHI and PII information in the last 5 years.

19. All documents reflecting or relating to investigation policies and procedures of employees, agents, servants, and/or representatives accused of improperly disclosing PHI and PII information in the last 5 years.

20. All documents reflecting or relating to any internal or external investigation conducted by

LH and/or in conjunction or connection with any external person or entity, including without limitation, any private or governmental agencies, and any resulting outcome of the investigation.

21. All policies or procedures you have or had in place between 2010 to the present for gaining knowledge of, documenting, and retaining documentation of an improper disclosure of PHI and PII information by any of your agents, employees, servants, or representatives.

22. Any surveys, analyses, audits, or like studies performed by you or any of your employees, agents, servants, or representatives pertaining to protection of, or improper disclosure of, PHI and PII information.

23. All documentation reflecting recommendations of means or methods to reduce or minimize improper disclosure of PHI and PII information by any of your employees, agents, servants, or representatives.

24. All documentation, correspondence, materials, or reports between Defendant and the Health and Human Services Office - Office of Civil Rights regarding any wrongful disclosure of PHI and PII information or breach of Defendant's duties pursuant to HIPAA and or HITECH from 2010 to the present.

25. All incident reports, investigation reports, computer printouts or records, reflecting or relating to any claim or lawsuit by any person or entity against you for wrongful or improper disclosure of PHI and PII information from 2010 to the present.

26. All documents relating to defenses asserted by you in Defendant's Answer to Plaintiff's Petition.

27. In the event you contend that any document or thing once existed but does not now exist, please produce your document retention policies and procedures with regard to the document or thing which you contend no longer exists, and all documents requesting or authorizing the destruction or other reason for the document or thing's unavailability at this time.

28. All documents given to patients or their guardians regarding the retention and protection of their PHI and PII information.

29. All insurance policies, declaration pages, or documents related to other funds, entities, and/or responsible parties which might afford coverage to Defendant for liability to which Defendant may be exposed as a result of the incidents described in Plaintiff's Petition.

30. All letters or other documents evidencing any reservation of rights agreement from any insurance company participating in the defense of this lawsuit.

31. The curriculum vitae of any expert witness that you intend to call to testify at trial.

32. All documents provided to each expert witness that you intend to call to testify at trial in this matter.

33. All documents relied upon for each opinion of each expert witness identified by you.

34. A list setting forth each case in which each expert identified by you has given testimony.

35. All documents or tangible things prepared by any expert whom you expect to call as a witness, including but not limited to his report, factual observations, opinions, conclusions, photographs, field notes, calculations, models and exhibits.

36. Copies of all statutes, rules, regulations, laws and/or any other authority which you contend relate to any Affirmative Defense in this case.

37. All documents and exhibits you plan to offer at trial.

Respectfully submitted,

Maureen M. Brady          MO #57800
Lucy McShane             MO #57957
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Phone: (816) 888-8010
Fax: (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
         lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFF**

IN THE DISRICT COURT OF LABETTE COUNTY, KANSAS

| | |
|---|---|
| D.H., individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| LABETTE HEALTH FOUNDATION, INC. Serve: Spenserv, Inc. 6201 College Blvd. Suite 500 Overland Park, Kansas 66211 | ) ) ) ) ) ) ) |
| Defendant. | |

Case No:
Division:

## PLAINTIFFS' FIRST INTERROGATORIES TO DEFENDANT

**COMES NOW** Plaintiff, by and through counsel, and pursuant to Rule 57.01, Missouri Rules of Civil Procedure, hereby respectfully requests that Defendant Labette Health, (herein after either "Defendant" or "LH") answer the following interrogatories within forty-five (45) days from the date of service of these interrogatories.

## DEFINITIONS AND INSTRUCTIONS

1.     Your ANSWER to one interrogatory or part of an interrogatory may be incorporated by reference in ANSWER to other interrogatories or parts of interrogatories if the clarity of the ANSWER will not be compromised.

2.     In the following interrogatories, if you refuse or fail to answer fully an interrogatory, electing instead to rely on the provisions of Rule 57.01(c)(4), Missouri Rules of Civil Procedure, for each unanswered interrogatory, please identify with particularity the records from which the answer may be derived or ascertained, as well as the volume and numbers of the documents comprising the records responsive to said interrogatory. Also, please set forth a description of the burden on you in deriving or ascertaining the answer and state why this burden

1

will be substantially the same for plaintiffs who are unfamiliar with the records and the organization thereof. Finally, for each of the Rule 57.01(c)(4) ANSWERs, please produce each and every index, catalog, or other record which lists any records that you are offering to produce under Rule 57.01(c)(4).

      3.      If you object to any interrogatory on the basis of a privilege or other legal doctrine, then for each objection:

          a.   State the privilege or other doctrine that is the basis for your objection;

          b.   State the factual basis on which you rely for your claim that a privilege or other legal doctrine applies to the interrogatory which you refuse to answer; and

          c.   Identify all persons with knowledge of the facts set forth in your ANSWER.

      4.      "Document" or "documents" means any and all information in tangible form and shall include, without limiting the generality of the foregoing, all letters, telegrams, telexes, teletypes, correspondence, records, x-rays, contracts, drafts, agreements, leases, notes to file, reports, memoranda, mechanical or electronic recordings or transcripts of such recordings, information stored on computers, blueprints, flow sheets, calendar or diary entries, memoranda of telephone or personal conversations, memoranda of meetings or conferences, studies, reports, interoffice and intra-office communications, quotations, inquiries, offers, circulars, statements, manuals, summaries, newsletters, compilations, maps, electronic mail, computer files or records stored in electronic media, charts, graphs, propositions, articles, announcements, newspaper clippings, books, records, videotapes, films, tables, books of account, ledges, vouchers, canceled checks, invoices, bills, opinions, certificates, promissory notes, and other evidence of indebtedness and all drafts and copies of documents as hereinabove defined by whatever means made. If multiple copies of a document exist, each copy that is in any way not completely identical to a copy that is being identified should also be identified.

      5.      "Communication" refers to any transmission or transfer of information of any kind, whether orally, in writing, or in any other medium at any time or place and under any circumstances whatsoever.

      6.      "Person" means any individual, corporation, partnership, joint venture, group, association or other organization.

7.      To "identify a person" or equivalent language means to state his/her name, last-known address, and if employed, his/her job title or position, and the name and address of his/her employer.

8.      To "identify a document" or equivalent language means to state:

    a.   The identity of the person who prepared it;

    b.   The identity of the person who signed it;

    c.   The identity of each person to whom it was addressed or distributed;

    d.   The nature or substance of the document with sufficient particularity to enable it to be identified;

    e.   The date and, if it bears no date, the date when it was prepared; and

    f.   The physical location of the document and the name of its custodian(s).

9.      "Referring" or "relating to" means constituting, respecting, reflecting, concerning, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing or evaluating.

10.     "You" or "your" means the party to whom these interrogatories were addressed and its elected or appointed officials, officers, directors, employees, agents, representatives or anyone else acting on its behalf. "You" or "your" shall include all of your subsidiaries, related companies, divisions, affiliates and agencies.

11.     As used herein, the term "LH" means Defendant Labette Health.

12.     As used herein, "medical records" means those records or other private health information as defined by HIPAA under 45 C.F.R. §160.103.  Medical records includes those documents that were sent to defense counsel as set forth in Plaintiff's petition.

13.     As used herein, "the Disclosure(s)" means the alleged disclosure of plaintiffs' private health information by Defendant LH or any other of your agents, employees, servants, or representatives to anyone who is not an agent, employee, servant, or representative of LH.

14.     If, in responding to any request, you perceive any ambiguity in construing the interrogatory, instruction, or definition relevant to the interrogatory, set forth the matter deemed ambiguous and the construction chosen or used in answering the interrogatory.

15.     Each interrogatory shall be deemed continuing so as to require prompt supplemental Answers if information requested is obtained or discovered subsequent to the time of responding to these interrogatories.

## INTERROGATORIES

1.  Please state:

    a.    The name and address of the person or persons answering these interrogatories;
    b.    His/her relationship to defendant; and,
    c.    his/her position of employment.

    **ANSWER:**

## STATEMENTS

2.    Have any statements, written or otherwise, been obtained from a witness or anyone other than Plaintiff by a person acting on your behalf in connection with the occurrence described in Plaintiff's Petition?  If so, state:

    a.    The date of each statement;
    b.    The name and address of each person whose statement was taken;
    c.    Whether such statement was written, recorded or taken by any other means;
    d.    The name and address of the person who took said statements;
    e.    Describe the method by which the statement(s) was taken;
    f.    The name and address of the present custodian of the statements.

    **ANSWER:**

## POLICIES AND PROCEDURES

3.    Please state the name, job title, address and contact information for each person involved in developing, producing, creating, performing, conducting, moderating, and/or organizing any and all training manuals, programs, policies, rules, regulations, seminars, meetings,

presentations, or the like relating to protection and/or treatment of confidential health information from 2014 through the present, and if that person is or was an employee of LH.

**ANSWER:**

4.      Please list the policies and/or procedures for discovery of, documenting, investigating, and retaining documentation of complaints or allegations of the disclosure of confidential health information without patient approval or court order by your employees, agents, servants, or representatives, and identify all documents related to the same.

**ANSWER:**

5.      Please list the names, address, employment, job titles, job duties, and contact information, of any person or entity charged with the handling, filing, preservation or destruction of medical records at LH from 2014 to the present.

**ANSWER:**

6.      Please list each meeting, presentation, training session, seminar or the like that employees of LH attended at which protection of confidential health information was discussed or instructed from 2014 through the present. For each such training session, please identify all persons present, the substance of the discussions, and identify any documents reflecting such discussions.

5

**ANSWER:**

## SIMILAR INCIDENTS BEFORE OR AFTER OCCURRENCE

7.     Please state whether any other claims or suits have been made at any time against

BMC or any of its affiliates, or parent companies, and/or any of its employees, representatives,

servants, or agents involving allegations of disclosure of confidential health information without

patient approval or court order.  In your answer for each such claim or suit, please identify:

     a.     The person making the claim and the date the claim was made;
     b.     The caption and style of the action, if filed; and
     c.     The disposition of each claim.

**ANSWER:**

8.     State whether any complaints (i.e. lawsuits, letters, verbal complaints) have ever

been made regarding Defendant's, employees, servants, agents, or representatives method of

disclosing of patients' medical records as set forth in Plaintiff's Petition.   If yes, please state:

     a.     The full name, address, and phone number of each individual that has made
          complaint about Defendant's actions.
     b.     A description of each complaint in detail and further describe what if any measures
          were taken to address the complaint.

**ANSWER:**

## FACTS AND WITNESSES

6

9.      For each of the following listed topics, identify all persons who have knowledge of such topics, stating briefly their relationship to LH.

    a.      Facts pertaining to the allegations of the Petition; and,
    b.      Facts pertaining to LH's defenses and affirmative defenses.

**ANSWER:**

10. For each individual you intend to call as a witness at trial, please state the following:

    a.      Full name, last known address and telephone number;
    b.      Occupation, and name and address of place of employment;
    c.      General nature of the subject matter on which each such person identified is expected to testify.

**ANSWER:**

11.      Identify, in detail, how the PHI and PII was stored and/or maintained and who stored the PHI and PII. If stored on a computer, please identify the physical location of any computer server, what person(s) owns, operates, maintains, and/or controls over any server.

**ANSWER:**

12.      Please state the name(s), job title, and job duties of BMC's Privacy and/or Compliance Officer.

**ANSWER:**

13.      Provide a description of the internal investigation and resulting findings associated with the Breach subject of this litigation. Specifically, please state:

a. The name, job title, job duties and contact information of the person(s) and/or entity(s) who conducted the investigation;
b. The steps taken during the investigation;
c. The finding of the investigation;
d. The steps taken to discovery the harm which befell each person affected by the Breach; and,
e. The steps taken to mitigate the harm which befell each person affected by the Breach.

**ANSWER:**

14. Provide a description of all categories of PHI and PII stored during the time of the Data Breach.

**ANSWER:**

15. Describe how Defendant LH learned of the disclosure, including the date you learned of the h, the identity of person(s) who notified Defendant of the breach, who specifically with Defendant received such notification, and all details, information, and communications contained in or regarding such notification.

**ANSWER:**

16. Describe Defendant LH's mechanisms, policies, procedures, protocols, checklists and methods of securing and protecting PHI and PII provided to it that were in existence during the Relevant Time Period.

**ANSWER:**

8

17.     With regard to your response to Interrogatory No. 13, identify any that were not followed, in whole or in part, during the Relevant Time Period, and when you became aware of such.

**ANSWER:**

18.     Describe how Defendant LH changed its mechanisms, policies, procedures, protocols, checklists and methods regarding the retention and protection of PHI and PII (including, *inter alia*, the nature of the change, the date of the change, and the effective date of the change), after Defendant learned of the Disclosure.

**ANSWER:**

19.     State whether any PHI and PII maintained and/or stored by Defendant BMC has ever been accessed without authorization—other than the Breach at issue in this case—and for each such occurrence, provide:  (i) the date of the occurrence; (ii) a description of all documents and information accessed; (iii) the number of persons whose documents and information were accessed without authorization; (iv) whether the occurrence was publicly reported; (v) if the occurrence was not publicly reported, all reasons for not publicly reporting the event; (vi) whether the occurrence was reported to law enforcement; and (v) if the occurrence was not reported to law enforcement, all reasons for not reporting the event.

**ANSWER:**

20.     Identify all insurance agreements and policies under which an insurance business

9

may be liable to satisfy all or part of a possible judgment against Defendant LH in this action or to indemnify or reimburse for payments made to satisfy any judgment against LH, and for each state:

    a)  The name of the insurance company;

    b)  The policy number;

    c)  The effective policy period;

    d)  The maximum liability limits for each person and each occurrence, including umbrella and excess liability coverage; and

    e)  The named insured(s) under the policy.

**ANSWER:**


21. Identify the types of information that was disclosed for Plaintiff as a result of the disclosure.

    **ANSWER:**


22.    Describe all information, including PHI and PII, relating to Defendant's employees, that Defendant shares with any other third party, and provide the reasons for such disclosure.

    **ANSWER:**


23.    Identify all employees, agents and any other individuals who disclosed the PHI and PII at issue in this case and state in detail all disciplinary actions taken against said individuals.

    **ANSWER:**

## **EXPERTS**

24.     Each person the Defendant expects to call as an expert witness at trial, stating for each such expert:

1.  Name;

2.  Address;

3.  Occupation;

4.  Place of Employment;

5.  Qualifications to give an opinion (if such information is available on an expert's curriculum vitae you may attach a copy thereof in lieu of answering this interrogatory subpart).

a.  With respect to each expert listed, please state the subject matter on which the expert is expected to testify and the expert's hourly deposition fee.

b.  Identify each non-retained expert witness, including a party, who the Defendants expect to call at trial who may provide expert witness opinion testimony by providing the expert's name, address and field of expertise.  State also any opinions the expert will testify to at trial.

**ANSWER:**

25.     Identify all non-retained expert witnesses you intend to call to testify at trial pursuant to Missouri Rule of Civil Procedure 56.01 (b)(5).

**ANSWER:**

## **AFFIRMATIVE DEFENSES**

26.     Do you claim that any other person or entity is liable to Plaintiff or Defendant for the allegations contained in Plaintiff's Petition? _____ YES _____ NO

If yes, please state:

a.     The name, job title, job description, and contact information for each such person or entity; and,
b.     All the facts, including documents, correspondence, contract or other materials upon which you base your claim.

**ANSWER:**

27.     For each of your Affirmative Defenses state the factual and legal basis for each defense, and identify any applicable statutes, rules, regulations and/or laws regarding each defense.

**ANSWER:**

## **WARNINGS AND/OR NOTICE**

28.     Has Defendant ever been warned, informed and/or advised that disclosure of medical information without patient authorization or court order may be inappropriate, illegal and/or in violation of any laws, regulations, contracts, or other obligations?  This interrogatory is

including but not limited to communications from government agency(s), attorneys, regulators,

trade magazines, etc.  If so, please state the following:

1. The source of the warning/advice/information
2. The approximate date of the warning/advice/information
3. The medium of the warning/advise/information
4. The specific substance of the warning/advise/information
5. Whether or not your practices changed or were influenced by the warning/advise information

**ANSWER:**

Respectfully submitted,

*Maureen M. Brady*

_____

Maureen M. Brady      MO #57800
Lucy McShane         MO #57957
MCSHANE & BRADY, LLC
1656 Washington Street, Suite 120
Kansas City, MO 64108
Phone:  (816) 888-8010
Fax:  (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com
       lmcshane@mcshanebradylaw.com
**ATTORNEYS FOR PLAINTIFF**

## VERIFICATION

STATE OF _____          )
                                                                )   ss
COUNTY OF _____          )

       I, _____, being duly sworn upon my oath, state that I am a duly appointed representative of Defendant Boulware Medical Clinic and have the authority to answer these Interrogatories on behalf of same and that the answers are true, correct and complete according to the best of my knowledge, information, and belief.

                                           _____
                                         Affiant

       SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 2022.

                                           _____
                                         NOTARY PUBLIC

My Commission Expires:

14